IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| PERRY KEVIN SASSER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CASE NO. 2:04-cv-339-F |
| | ) | WO |
| STATE OF ALABAMA DEPARTMENT | ) | |
| OF CORRECTIONS, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

# **MEMORANDUM OPINION AND ORDER**

Plaintiff Perry Kevin Sasser (hereinafter "Plaintiff") brings this action against his employer, State of Alabama Department of Corrections (hereinafter "ADOC"), alleging claims of race discrimination, hostile work environment and retaliation pursuant to Title VII, 42 U.S.C. § 2000e, *et seq.* (hereinafter "Title VII"). (Doc. # 1, Compl). Sasser also alleges violations of his constitutional rights secured by the First and Fourteenth Amendments against ADOC and Warden Stephen Watson (hereinafter "Watson"), in his individual and official capacities . (*Id*.). Plaintiff brings these constitutional claims under 42 U.S.C. § 1983 based upon alleged discrimination which violated his due process, equal protection and free speech rights. (*Id*.).

This cause is before the court on the defendants' motion for summary judgment. (Doc. # 20). The court has reviewed the submissions of the parties and finds that, for the reasons set forth below, the motion is due to be GRANTED.

## I.  FACTS[1] AND PROCEDURAL HISTORY

Plaintiff, a Caucasian male, has been employed by the ADOC as an officer for more than twenty years.  Plaintiff commenced his employment with ADOC on April 17, 1983.  In 1994, Plaintiff was transferred to the ADOC's Work Release Center (hereinafter "Center") in Alexander City, Alabama and, at all relevant times, was a Corrections Officer at the Center.[2]  Plaintiff alleges that Watson, a Caucasian male and Warden of the Center,[3] consistently discriminated against Caucasian employees in the application of work rules and standards.  Plaintiff also alleges that he was subjected to retaliation and a racially hostile work environment.  The facts pertaining to Plaintiff's complaints are set forth below.

Plaintiff's complaints stem from disciplinary action taken against him in 2002.  According to Plaintiff, his disciplinary record at the Center was "outstanding" until two disciplinary charges were made against him in the summer of 2002.  (Pl. Aff. at ¶ 4).  The first charge was for an incident which occurred on July 19, 2002.  In that incident, Plaintiff was accused of making derogatory and racially offensive remarks to an inmate concerning the inmate's head covering.[4]  The second charge was for an incident which occurred on

---

[1]  This recitation of "facts" is based upon materials presented by the parties, viewed in the light most favorable to the plaintiff.

[2]  Plaintiff was promoted to Sergeant or Correctional Officer II on March 27, 1999, but subsequently accepted a voluntary demotion to Correctional Officer I.

[3]  According to Plaintiff, Watson transferred to the Center in November 2001.  (Pl. Aff. at ¶ 3).

[4]  The specific facts in relation to the first incident are as follows:

August 6, 2002.  In that incident, Plaintiff was accused of making racially insensitive remarks to an African-American co-worker about a day labor job assignment.[5]

On August 21, 2002, in a written Notice of Recommendation for Suspension (hereinafter "Notice"), Watson informed Plaintiff of nine rule violations alleged against him for the two separate incidents and initiated suspension action.  In the Notice, Watson recommended that Plaintiff be suspended from duty without pay for fifteen days and that a hearing be convened to address the charges made against Plaintiff.  In a memorandum dated

---

On or about July 19, 2002, [Plaintiff] was assigned and was present as Shift supervisor at Alexander City Community Based Facility.  At approximately 6:50 a.m. on the above referenced date two inmates (a black inmate and a white inmate) were being checked out to the MasterBuilders Homes, Inc. by a civilian employee of the company.  As the vehicle that the civilian employee was driving began to depart the facility with the two inmates on board, [Plaintiff] yelled for the driver to stop.  When the driver stopped the vehicle, [Plaintiff] instructed the white inmate to relinquish a head garment (doo rag) that he possessed.  After a brief verbal exchange with the white inmate and the civilian employee [Plaintiff] stated, "You are not a fucking nigger, you don't need them ("doo rags") anyway."  The civilian employee and the two inmates then departed the facility.  [Plaintiff] advised the Warden that [he] disposed of the head garments by placing them in the shift office.

(Pl. Ex. 7, p. 2; Suspension Mem. from Comm'r Haley).

[5] The relevant facts pertaining to the second incident are as follows.

. . . Steward [II Amy] Barnett alleges that she was contacted by [Plaintiff] requesting an inmate for a day labor job.  She advised [Plaintiff] that she had two inmates on extra duty, identified the inmates, and claims [sic] that [Plaintiff] told her to send inmate Lachman because he had not been out on day labor.  Instead, Steward Barnett sent inmate Beamon because inmate Lachman did not wish to go.  She claims that at about 9:10 a.m., [Plaintiff] phoned her again and asked why she sent inmate Beamon instead of inmate Lachman.  She explained why and then asked [Plaintiff] what was the difference and he responded, "One was black and one was white."  Her statement contends that [Plaintiff's] comments were made in a joking manner. . . .

(Pl. Ex. 3, p. 8; Hr'g Tr.).

August 23, 2002, Watson requested that Dora Jackson (hereinafter "Jackson"), Personnel Director for the ADOC, review the Notice and schedule a hearing.  Watson also requested that Plaintiff be reassigned to another facility pending the suspension hearing because "it [was] in the best interest of the [ADOC], this facility, and the employee himself."  (Pl. Ex. 4).

On September 13, 2002, an administrative hearing was held and Terrance G. McDonnell (hereinafter "McDonnell"), Warden III at Kilby Correctional Facility, presided over the hearing.  After hearing all of the testimony and reviewing Plaintiff's employee service record, McDonnell, the appointed hearing officer, found Plaintiff guilty of seven of the nine violations regarding the July 19, 2002 incident and not guilty of all nine rule violations regarding the August 6, 2002 incident.  (Pl. Ex. 3, p. 6).[6]  McDonnell

---

[6]  Specifically, the hearing record establishes the following findings:
In regard to the July 19, 2002 incident. . . [McDonnell found Plaintiff guilty or not guilty of] the following.

A.  Employees are expected to:

| | |
|---|---|
| Guilty | 2.  Render full, efficient, and industrious service. |
| Not Guilty | 3.  Respond promptly to directions and instructions. |
| Guilty | 4.  Exercise courtesy and tact. |
| Guilty | 7.  Observe the laws, rules, and regulations. |
| Not Guilty | 8.  Recognize their responsibilities for taking an active part in the Department of Corrections affairs. |
| Guilty | 9.  Uphold, with integrity, the public trust involved in their positions. |
| Guilty | B.  Each employee's conduct shall, at all times, be consistent with the maintenance of proper security and welfare of the institution and of the prisoners under his or her supervision. |
| Guilty | C.  No employee shall: 3.  Use profane or abusive language in supervising prisoners. |
| | [and] |
| Guilty | II. B.  Employees are expected to conduct themselves in a manner that will not bring discredit upon this institution, Department of |

4

recommended that Plaintiff receive a written reprimand, or "at most a [five] day suspension, in lieu of the [fifteen] day suspension." (*Id*. at p. 8).

On the same date, after reviewing the testimony presented at the administrative hearing, Watson sent a memorandum to Glenn Newton (hereinafter "Newton"), Deputy Commissioner and Watson's immediate supervisor, maintaining his recommendation that Plaintiff receive a fifteen day suspension and transfer to another institution. A few months later, in a letter dated October 16, 2002, Michael Haley, Commissioner of the ADOC (hereinafter "Commissioner Haley"), informed Plaintiff that he approved McDonnell's findings but concurred with Watson's recommendation for a fifteen day suspension. Consequently, Commissioner Haley ordered Plaintiff's suspension without pay for a period of fifteen days to commence on October 19, 2002 and end on November 2, 2002. Commissioner Haley ordered Plaintiff to return to duty on November 9, 2002. In addition, Commissioner Haley informed Plaintiff that he was transferred from the Center to the Kilby Correctional Facility (hereinafter "Kilby"), effective November 2, 2002 with a reporting date of November 9, 2002. Hence, upon Plaintiff's return to duty from his suspension, he was directed to report to the Warden at Kilby.

---

Corrections or the State of Alabama. This is especially important during working hours and includes such thing [sic] as obeying traffic laws while in State vehicles, displaying courtesy and respect to the general public and visitors to the facility.

(*Id*. at p. 7). Pertaining to the August 6, 2002 incident, McDonnell found Plaintiff not guilty on all rule violations. (*Id*.).

Around this time, Plaintiff took a leave of absence from work due to his wife's surgery.  During his leave of absence, Plaintiff obtained an appointment with Commissioner Haley and spoke with him regarding his suspension.  As a result of this meeting, in a letter dated November 14, 2002, Commissioner Haley altered Plaintiff's discipline by reducing his suspension without pay from a period of fifteen days to five days and rescinding Plaintiff's transfer from the Center to Kilby.[7]  Commissioner Haley thus redirected Plaintiff to report to the Center at the "rank of CO II."  (Pl. Ex. 9).[8]

**HOSTILE WORK ENVIRONMENT.**  According to Plaintiff, after he returned to work from his suspension, he was subjected to a hostile work environment.  He alleges that Watson transferred him from supervisor on the first shift (6:00 a.m.- 2:00 p.m.) to the third shift (10:00 p.m.- 6:00 a.m.), and that he had to voluntarily accept a demotion from Sergeant to CO I in order to return to the first shift.  Plaintiff also complains that several African-American employees have made efforts to ostracize him and accuse him of misconduct.[9]

_____

[7]  Plaintiff had already served the fifteen day suspension so ten days were restored to him.

[8]  Since Plaintiff had taken a leave of absence during this time, he never physically reported to Kilby and thus simply returned to work at the Center.

[9]  Plaintiff refers to the following incident as an example of the alleged ostracism.

Captain George Carter instructed [Lieutenant Diana Harrison] to have [Plaintiff] get a urine sample from Officer Thomas Owens. . . . [Harrison] advised Officer Owens not to use the restroom because [Plaintiff] needed to get a urine sample and he was not at the Institution yet.  After a few minutes, Officer Owens stated that he would rather not have [Plaintiff] to be the one to take his (Officer Owens) [sic] urine sample because he (Officer Owens) felt that [Plaintiff] was prejudice. [sic] Officer Owens stated that [Plaintiff] had been written up for this.  I advised Officer Owens that [Plaintiff] was not written up for being prejudice [sic] but for making a racial

6

**UNWARRANTED DISCIPLINE.**  Plaintiff contends that he was subjected to unwarranted discipline by Watson in August 2003 when he was reprimanded for paying an inmate to repair gardening equipment.[10]  Further, Plaintiff contends that Watson has consistently discriminated in the application of work rules and standards.

**GRIEVANCES.**  Dissatisfied with his working conditions, Plaintiff submitted four grievances to the Office of the Deputy Commissioner.[11]  Plaintiff's first grievance was submitted on September 18, 2002.  In this grievance, Plaintiff complained that he was not afforded due process in his disciplinary hearing and he requested that the disciplinary action be expunged from his file.[12]  Plaintiff's second grievance was submitted on September 19,

---

comment.  However, [Lieutenant Diana Harrison] did tell Officer Owens that [she] would get Sergeant E. B. Turner to take the sample the next day. . . .

(Pl. Ex. 12).

[10]  Plaintiff asserts that it was common practice in the ADOC for employees to check out inmates so that the inmates could perform services or work for the employees.  (Pl. Aff. at ¶ 12).  However, this practice was abolished some time in July 2003.  (*Id.*).  Plaintiff, unaware of the abolishment of the policy, paid an inmate twenty dollars to repair his lawn mower and "weed-eater" in August 2003 and received a written warning from Watson for doing so.  (*Id.*; Def. Ex. 11).

[11]  Grievances are a tiered process, originating with a complaint by the employee to the immediate supervisor, progressing to the institutional or division head, and ultimately to the Commissioner or his designee.  All of Plaintiff's grievances progressed to the Commissioner's designee, Roy Hightower (hereinafter "Hightower"), Institutional Coordinator.

[12]  (Def. Ex. 9).  Plaintiff asserted that he was not afforded due process because (1) he did not receive written notification that the suspension hearing was rescheduled from September 12, 2002 to September 13, 2002; (2) a civilian witness was "made to testify" after he refused to do so on September 12, 2002; and (3) this same witness was not informed on September 12, 2002 that he could be forced to testify.  (*Id.*).  Hightower reviewed Plaintiff's grievance and Watson's response and made the following final decision on behalf of ADOC:

A hearing in reference to your grievance was held on 10-3-02 at [the Center].  After

2002. In this grievance, Plaintiff complained that the employees were required to perform work outside of their job classifications.[13] His third grievance was submitted on September 18, 2003 and complained of discriminatory discipline by Watson.[14] His fourth grievance was

---

> listening to the statement of [Plaintiff] and Warden Watson, it was determined that there were no due process violations. [Plaintiff], through his own admission, was told of the change in the hearing date. According to both Warden Watson and [Plaintiff] the civilian witness cannot be made to testify at an Administrative hearing. Remedy sought is denied.

(*Id*.).

[13] (Def. Ex. 10). Plaintiff contended that "[a]ll Officers/Staff [at the Center] [were] made to work outside their job classification on a dailey [sic] bases [sic] with the following duties which is [sic] not in [their] classifications: [i]ssuing of medications, classification, Stewards, and Maintinance [sic] . . and are not compensated for these extra duties." (*Id*.). Plaintiff requested that "these other classification[s] not perscribe [sic] to the CO's Academy Training, be desolved [sic] to no longer include the COs perform them [sic]." (*Id*.). Hightower reviewed Plaintiff's grievance and Watson's response and made the following final decision on behalf of ADOC:

> A hearing in reference to your grievance was held on 10-3-02 at [the Center]. After listening to the statement of [Plaintiff] and Warden Watson, it was determined that the officers and other staff members are not made to work outside their job classification. Officers are asked to accompany inmates or supervise inmates on maintenance projects, open the door for inmate kitchen workers and sometimes issue material for meal preparation. Officers were asked to review inmate files to make recommendations and to issue medication prescribed by a doctor, which is labeled and stored under lock and key.

> Based upon the above facts, Officers and other staff members are not made to work outside of their job classifications. Therefore, the remedy sought is denied.

(*Id*.).

[14] In his grievance Plaintiff asserts that "[s]ince Warden Watson ['s] assignment here at [Center], White Officers are being DISCRIMINATED against under Admin. Reg. 208." (Def. Ex. 11) (emphasis in original). Plaintiff maintains that "[w]hite Officers receive more punishment than do Black Officers, for the same offence [sic]." (*Id*.). Plaintiff requests that "[a]ll disciplinary actions taken against any officer by Warden Watson . . . be RESCINDED/EXPUNGED from all files." (*Id*.). Having met with Plaintiff on October 7, 2003 and after investigating the grievance, Hightower made the following final decision on behalf of ADOC:

submitted on June 5, 2004 and contains complaints involving the inability of third shift and first shift correctional officers to receive weekends off. [15]  All of Plaintiff's grievances were reviewed, investigated and denied.

**FORMAL COMPLAINTS.**  In July 2003, Plaintiff filed an Equal Employment Opportunity Commission (hereinafter "EEOC") complaint of discrimination alleging that he was a "victim of reverse race discrimination."  (Def. Ex. 15).  Plaintiff complained of disparate treatment in disciplinary actions and asserted that the "disparate treatment [he] [has] received is due . . . to the fact that the associate commissioner Glen Newton is black, and he has encouraged [Plaintiff's] immediate supervisor, [Watson], to bare down more severely on white employees, even though [Watson], himself, is white."  (*Id*.; Pl. Aff. at ¶ 9).

---

[Plaintiff's] complaint was that Warden Watson W/M disciplines white employees more severely than he disciplines black employees.

[Plaintiff] failed to provide any evidence or testimony to support his claim.  Warden Watson submitted evidence that since his arrival at [the Center], does not [sic] support the claim of [Plaintiff].

Therefore, the remedy sought by [Plaintiff] is denied.

(*Id*.).

[15]  (Def. Ex. 12).  Plaintiff complains that "third shift and first shift correctional officers cannot receive off days of Saturday and Sunday" and requests that "off days of Saturday and Sunday be offered also on the first and third shifts."  (*Id*.).  After investigating the complaint and meeting with Plaintiff on July 2, 2004, Hightower made a final determination on behalf of ADOC.

The Warden has to consider the entire institutional security when making decisions concerning off days, etc.  It is his determination that the staffing level does not allow for 1st and 3rd shifts to have Saturdays and Sundays off.  The remedy sought is denied.

(*Id*.).

Shortly thereafter, this EEOC charge was dismissed. (Def. Ex. 16; Pl. Aff. at ¶ 2). On August 25, 2003, Plaintiff filed a Supplemental EEOC charge complaining of retaliatory treatment due to his previous EEOC charge and a racially hostile work environment. (*Id.* at ¶¶ 2 & 3). Plaintiff also complained that he received an "unfairly low rating" on an employee performance appraisal on July 16, 2003 in retaliation for having filed his first EEOC charge. (*Id.*). According to the Complaint, Plaintiff received his right to sue letter on January 7, 2004.

**THIS LAWSUIT.** On April 19, 2004, Plaintiff filed this action alleging claims of race discrimination, hostile work environment and retaliation in violation of Title VII against the ADOC. (Doc. # 1, Compl.). Plaintiff also alleges violations of his constitutional rights secured by the First and Fourteenth Amendments against ADOC and Watson under 42 U.S.C. § 1983 (hereinafter "Section 1983"). (*Id.*). Plaintiff seeks compensatory damages, punitive damages, court costs, attorneys' fees, and declaratory and injunctive relief. (*Id.*).

On November 22, 2004, the defendants filed a motion for summary judgment accompanied by a memorandum brief and exhibits. (Docs. # 20 & 21). Plaintiff filed his response to the motion on February 22, 2005. (Doc. # 36). Thus, the motion is ripe for this court's consideration.

## II. JURISDICTION AND VENUE

The court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights), and 42 U.S.C. §§ 2000-4(f)(4).

The parties do not contest personal jurisdiction, and the court finds adequate allegations in support of personal jurisdiction.

### III.  STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party.  An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255. After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

## IV. DISCUSSION

The Defendants move for summary judgment in their favor on all of Plaintiff's claims. In doing so, Defendants argue that there is no genuine issue as to any material fact and that they are entitled to judgment in their favor as a matter of law. Plaintiff opposes Defendants' motion arguing that questions of fact exist and the case must proceed to trial. The court has considered all arguments proffered by the parties and concludes that Plaintiff's claims are due to be dismissed.

*A.    Title VII Claims*

12

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . ." 42 U.S.C.A. § 2000e-2(a)(1). In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the Supreme Court established the allocation of the burden of production and an order for the presentation of proof in discrimination cases. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993). Under the *McDonnell Douglas* approach, a plaintiff has the initial burden of establishing a prima facie case of unlawful race discrimination by a preponderance of the evidence. 411 U.S. at 802. A prima facie case requires "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion." *Int'l Broth. of Teamsters v. United States*, 431 U.S. 324 (1977).

If the plaintiff establishes a prima facie case of racial discrimination, the burden then shifts to the employer to rebut the presumption by articulating legitimate, non-discriminatory reasons for its employment action. *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997). "This intermediate burden is 'exceedingly light.'" *Id.* (citing *Turnes v. AmSouth Bank, N.A.,* 36 F.3d 1057, 1061 (11th Cir. 1994)). The employer has the burden of production, not of persuasion, and thus does not have to persuade a court that it was actually motivated by the reason advanced. *See McDonnell Douglas*, 411 U.S. at 802; *Texas Dep't of Comty. Affairs v. Burdine*, 450 U.S. 248, 253-255 (1981).

Once the employer satisfies this burden of production, "the presumption of

13

discrimination is eliminated and 'the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (citations omitted). The establishment of a prima facie case does not in itself entitle a plaintiff to survive a motion for summary judgment. *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987); *Pace v. Southern Ry. Sys.*, 701 F.3d 1383, 1389 (11th Cir. 1983). After an employer proffers non-discriminatory reasons for its actions, "[i]n order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered . . . reasons is pretextual." *Chapman*, 229 F.3d at 1037.

At the outset, the court notes that Plaintiff refers to his claims as "reverse discrimination" claims. The Eleventh Circuit has elucidated that such verbiage is not appropriate in the legal analysis of this court. *See Bass v. Bd. of County Com'rs. Orange County, Fla.*, 256 F.3d 1095, 1102-1103 (11th Cir. 2001) ("Discrimination is discrimination no matter what the race, color, religion, sex, or national origin of the victim."). Because "[r]acial discrimination against whites is just as repugnant to constitutionally protected values of equality as racial discrimination against blacks," *id*. at 1103, Plaintiff's claims are due to be treated as discrimination claims, not as "reverse discrimination" claims. Hence, Plaintiff's claims must be analyzed by this court as any racial discrimination claim. *Id*.

14

In this case, Plaintiff's Title VII allegations against Defendant ADOC fall into three recognized categories of prohibited discriminatory conduct: disparate treatment, retaliation and racially hostile work environment. The court will address each of Plaintiff's claims in turn.

### 1.   Disparate Treatment

The Eleventh Circuit has explained that, for the usual disparate treatment case where direct evidence is not present, "a plaintiff establishes a prima facie case of race discrimination under Title VII by showing: (1) he belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job. Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Holified,* 115 F.3d at 1561-62 (citations omitted).

In this case, Plaintiff fails to establish a prima case of race discrimination because he cannot satisfy the third prong. In spite of Plaintiff's allegations that Watson treated similarly situated employees more favorably, he has failed to present any evidence which supports these allegations. Rather, Plaintiff has merely presented unsubstantiated assertions which, alone, are not enough to withstand a motion for summary judgment.[16] *See Celotex,* 477 U.S.

---

[16]   Plaintiff claims that the following individuals are comparators who have received favorable treatment:

(a) Officer Juanice Tensley: a black female, has stated openly that she does not like "white people" and has been charged with discourteous and disrespectful treatment of white families and inmates, but Watson has not instigated any disciplinary action

at 322, 106 S.Ct. 2548.  It is undisputed that Watson initiated suspension action against Plaintiff because it was reported that he had uttered a racial slur to an inmate and was assigning inmates to day labor based upon their race.  Based upon that conduct, Watson also requested that [Plaintiff] be reassigned to another facility because Watson believed that he could no longer be effective as a Supervisor.  (Pl. Ex. 5).  It is also undisputed that Watson issued a written warning to Plaintiff for his employment of an inmate to repair his gardening equipment which was in violation of an ADOC work rule.  Plaintiff simply has presented no evidence of a non-Caucasian similarly situated employee who engaged in the same conduct but was treated favorably.  Having failed to do so, he has not established a prima facie case

---

against her.  Tensley also used profane and abusive language to an [inmate] in telling him that he was a "fat-ass," but received no discipline from Watson. . . . Tensley also violated departmental policy when she allowed an inmate to have possession of his green institutional file.  No discipline was instituted against her for this breach of security.

(b) Officer [George] Smith: a black male, left handcuff keys on the key ring with the van keys, a breach of security. . . Officer Smith also called [Plaintiff] a "redneck" on May 8, 2002, . . . Warden Watson refused to take any disciplinary action on [Plaintiff's] complaint of this abusive conduct by the Black officer toward [Plaintiff].

(Pl. Aff. at ¶¶ 13 & 14).  Plaintiff however fails to show how these individuals are similarly situated to him (i.e., positions, titles, responsibilities, job duties, etc.) and fails to show how their alleged misconduct is alike his.  Indeed, the record before this court includes no evidence that Plaintiff was disciplined for a breach of security, uttering derogatory comments relating to weight, nor using racial slurs against other employees.  Further, Plaintiff testified in his deposition that in October 2002, Officer Smith wrongfully sold an inmate an automobile. (Pl. Dep. at p. 144).  Officer Smith received a fifteen day suspension and an ethics violation as punishment for his action.  (Id. at pp. 144-145).  Considering this evidence, no reasonable factfinder can conclude that, even if Officers Smith and Tensley were similarly situated to Plaintiff, they received favorable treatment in relation to disciplinary adverse employment actions due to their race.  Simply stated, the evidence before this court, including the evidence submitted by Defendants which enumerates the disciplinary actions Watson has taken against other ADOC employees, establishes that Watson disciplines employees regardless of their race.

of disparate treatment.  Defendant is entitled to summary judgment on this claim.

2.     *Retaliation*

Under Title VII, it is an unlawful employment practice for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).  Under the *McDonnell Douglas* approach, as set forth above, a plaintiff has the  initial burden of establishing a prima facie case of unlawful discrimination by a preponderance of the evidence.  411 U.S. at 802.  "As with a discriminatory treatment claim, a plaintiff alleging a retaliation claim under Title VII must begin by establishing a prima facie case." *Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995).  The Eleventh Circuit has stated that

> To establish a prima facie case of [Title VII] retaliation, [an employee] must show: (1) [he] engaged in protected activity; (2) [his] employer was aware of that activity; (3) [he] suffered adverse employment action; and (4) there was a causal link between [his] protected activity and the adverse employment action.

*Maniccia v. Brown,* 171 F.3d 1364, 1369 (11th Cir. 1999) (*citing Little v. United Tech., 103 F.3d 956, 959 (11th Cir. 1997)*). "The causal link element is construed broadly so that 'a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" *Pennington v. City of Huntsville*, 261 F.3d 1262 (11th Cir.

17

2001) (citations omitted).[17]

In this case, ADOC does not argue that Plaintiff fails to satisfy the first two prongs of a prima facie case.[18]  Rather, ADOC argues that Plaintiff cannot establish the third  prong: adverse employment action.  In response, Plaintiff argues that he can establish that prong because

> subsequent to his return to work in Alexander City . . . he was forced to take a demotion in order to return to the fist [sic] shift; that he was referred to by black co-employees as a racist; that a black employee refused to take his urine specimen; that Watson reprimanded him for violation of a changed work rule that had not been disseminated to employees; that Watson illegally taped an official meeting which was part of his grievance process; and that he suffered from high blood pressure, sleeplessness and skin disorders. . .

(Pl.'s Resp.at p. 14).[19]  Despite Plaintiff's argument, the court agrees with ADOC.

---

[17]  The court notes that in Count Three of the Complaint, Plaintiff alleges that he was retaliated against in violation of Title VII, as well as 42 U.S.C. § 1981 and Section 1983.  The court will address Plaintiff's Section 1983 claims later in this Opinion, *infra*.  However, in regard to Plaintiff's  retaliation claim under 42 U.S.C. § 1981 (hereinafter "Section 1981"), the court finds no need to individually address this claim.  Title VII and Section 1981 have the same requirements of proof and are subject to the same analytical framework.  *See Richardson v. Leeds Police Dept.*, 71 F.3d 801, 805 (11th Cir. 1995); *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1060 (11th Cir. 1994); *Howard v. BP Oil Co., Inc.*, 32 F.3d 520, 524 n.2 (11th Cir. 1994).  Therefore, the court will explicitly address Plaintiff's Title VII retaliation claim with the understanding that the analysis applies to his Section 1981 retaliation claim as well.

[18]  It is undisputed in this case that Plaintiff engaged in protected activity when he filed an EEOC complaint in July 2003 complaining of disparate treatment and a grievance on September 18, 2003 complaining of discriminatory discipline by Watson.  It is further undisputed that Defendants were aware of that activity.

[19]  Apparently, Plaintiff has abandoned his retaliation claim relating to the "unfairly low rating" on his July 16, 2003 employee performance appraisal because he fails to address this claim in his response to the motion for summary judgment and fails to present any evidence on this claim.

"An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000).[20]   Whether an employee has suffered an adverse employment action is normally considered on a case-by-case basis.  *Id*. at 586.  It is clear, however, that not all conduct taken by an employer which causes a negative affect on an employee constitutes adverse employment action.  *Davis v. Town of Lake Park, Florida*, 245 F.3d 1232 (11th Cir. 2001).  There must be "some threshold level of substantiality that must be met for unlawful discrimination to be cognizable." *Wideman v. Wal-Mart Stores, Inc.,* 141 F.3d 1453, 1456 (11th Cir. 1998).  "This limitation is consistent with the basic principle that Title VII is . . . neither a general civility code nor a statute making actionable for the 'ordinary tribulations of the workplace.'" *Davis*, 245 F.3d at 1239 (quoting *Gupta*, 212 F.3d at 587); *see also Wu v. Thomas*, 996 F.2d 271, 273-274 (11th Cir. 1993) (noting that an adverse employment action does not result from every unkind act, even those without economic consequences).

---

*See Walton ex rel. R.W. v. Montgomery County Bd. of Educ.*, 2005 WL 1217256, * 4 (M.D. Ala. May 20, 2005) (Albritton, J.) (citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)).

[20]   The court notes that determining whether an employment action is adverse for purposes of Title VII is a matter of federal, not state, law.  *Hinson v. Clinch County, Georgia Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir. 2000).

In *Davis*, the Eleventh Circuit emphasized that for an employment action to be adverse it "must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way." 245 F.3d at 1239. While proof of direct economic consequences is not required in all cases, "the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Id*. Thus, to prove an adverse employment action "an employee must show a *serious and material* change in terms, conditions, or privileges of employment." *Id*. (emphasis in original). In determining whether a "serious and material" change in the terms, conditions, or privileges of employment has been established, *Davis* instructs the court to disregard the plaintiff's subjective view of the significance and adversity of the employer's action: "[T]he employment action must be materially adverse as viewed by a reasonable person in the circumstance." *Id*. (citation omitted).

In the instant case, the retaliatory acts claimed by Plaintiff, viewed individually or collectively, do not amount to adverse employment action.[21] This court is convinced that no

---

[21] In this discussion, the court does not consider Plaintiff's allegation that subsequent to his return to work, Watson forced him to take a demotion in order to return to the first shift. Without doubt, a demotion constitutes an adverse employment action. Notwithstanding, this demotion occurred during October or November 2002; but Plaintiff did not engage in his protected activity until July 2003 when he filed an EEOC complaint and in September 2003 when he submitted a grievance complaining of discriminatory discipline. A reasonable factfinder could not conclude that Plaintiff was demoted in retaliation for his protected conduct because the demotion occurred *prior* to the protected conduct. Stated otherwise, there could be no causal relationship between Plaintiff's protected activity and the claimed adverse employment action because the protected activity did not take place until after the alleged adverse employment action. Hence, "it is clear that the primary impetus for [the demotion] decision was not [Plaintiff's] grievance [nor EEOC complaint]." *Portera v. State of Ala. Dept. of Finance,* 322 F. Supp. 2d 1285, 1299-1300 (M.D. Ala. 2004) (Thompson,

reasonable person could view these actions, whether individually or collectively, as having a "serious and material change in the terms, conditions, or privileges" of Plaintiff's employment.  *See Davis*, 245 F.3d at 1239.  Thus, for example, even if Plaintiff proved that–outside of his presence–African-American employees referred to him as a racist or an African-American employee refused to have Plaintiff take his urine sample (Pl. Ex. 12), such actions do not constitute an adverse employment action.  There is also no evidence that, because of the content of the written warning Plaintiff received for violation of a work rule, he was subjected to any change in the terms and conditions of his employment.  Moreover, it is undisputed that Plaintiff was not placed on probation, suspended, subjected to a loss of pay or benefits, or otherwise disciplined as a result of the written warning.

Consequently, because adverse employment action is an indispensable element of a retaliation claim, Plaintiff's failure to present sufficient evidence for a reasonable jury to find that this element was met is fatal to his claim.  *See Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998) ("Although a plaintiff's burden in proving a prima facie case is light, summary judgment against the plaintiff is appropriate if he fails to satisfy any one of the elements of a prima facie case.") (citations omitted).  Having found no material issues of fact or law in existence, the court concludes that summary judgment on Plaintiff's retaliation claim is warranted.

3.    *Hostile Work Environment*

_____

J.).

In order to establish a prima facie case in a racially hostile work environment case, a plaintiff must "show: (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as [race]; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).  A hostile work environment claim under Title VII is established upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993).

Race is certainly a protected category under Title VII, and it is not disputed that the conduct at issue was unwelcome.  Nonetheless, Plaintiff has not produced evidence that Watson's  treatment of him was motivated by race, nor has he shown that the questioned conduct was severe enough to affect a term, condition, or privilege of employment.  While Plaintiff may believe that Watson treated him unfairly, Title VII does not create a "general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80 (1998).  Moreover, the comments and actions of the African-American employees were not sufficiently severe to violate Title VII, nor do they appear to have been

related to Plaintiff's race at all, but alternatively were related to their perception of Plaintiff's attitude towards African-Americans. *See Gonzalez v. Florida Dept. of Highway Safety and Motor Vehicles Div. of Fla. Highway Patrol,* 237 F. Supp. 2d 1338, 1350 (S.D. Fla. 2002) (comments which did not appear to be related to a plaintiff's race do "not even come close to stating a claim" of racial harassment), *aff'd,* 45 Fed. Appx. 886 (11th Cir. 2002) (table).

Furthermore, the acts about which Plaintiff complains, even when considered unitedly, were not severe enough to create an environment that affected a term or condition of employment. As the Supreme Court explained: "[I]n order to be actionable under the statute, a[n] ... objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787-88 (1998). Courts are "directed ... to determine whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances.' " *Id.* (quoting *Harris,* 510 U.S. at 21-22). Factors that can be considered in determining whether a hostile environment was created include "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23.

While it is clear that, subjectively, Plaintiff found the acts at issue offensive, he has not demonstrated that the conduct was frequent or severe enough to create a hostile work environment or constitute harassment. He complains of a total of four incidents over a nine-

month period,[22] and one of these incidents (the August 2003 warning for inmate repair services) involved reprimanding Plaintiff for violation of an ADOC regulation. "Title VII does not protect an employee from harsh criticism from [his] employer." *Portera,* 322 F. Supp. 2d at 1291. Watson's insistence that Plaintiff adhere to the regulations implemented by the ADOC and his written warning when he did not are not particularly severe. Even if Plaintiff is correct that he should not have received a written warning for the "inmate repair" incident, written "discipline by a supervisor, completely devoid of any statements which could possibly be construed as racially offensive, is not the type of pervasive discriminatory conduct that Title VII is meant to prevent." *Id.* Accordingly, Plaintiff has failed to establish a prima facie case for a racially hostile work environment, Defendants are thus entitled to summary judgment on that claim.

## B.    *Section 1983 Claims*

Section 1983 provides a remedy when a person acting under color of state law deprives a plaintiff of a right, privilege, or immunity secured by the Constitution, laws, or

---

[22] The commencement date for the alleged hostile work environment claim is unclear. In the Complaint, Plaintiff alleges that he was subjected to a hostile work environment "subsequent to the filing of his grievances regarding the discriminatory treatment he received." (Compl. at ¶ 15). The evidence indicates that Plaintiff's grievance complaining of discriminatory conduct was submitted on September 18, 2003. (Def. Ex. 11). However, in his response in opposition to the motion for summary judgment, Plaintiff argues that he was subjected to a "cold and hostile work environment following his return to work" after his suspension. (Pl. Br. at p. 5). He returned to work in late October or early November 2002. (Pl. Ex. 9). Giving Plaintiff the benefit of the doubt, the court has used the November 2002 date as the commencement date for his hostile work environment claim.

treaties of the United States.  42 U.S.C. § 1983.[23]  In order to establish a claim under Section 1983, a plaintiff must show a violation of a right secured by the Constitution of the United States, and also that the deprivation of that right was committed by a person acting under color of state law.  *See, e.g.*, *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) ("§ 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred") (internal quotes omitted) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n.3 (1979)); *Cummings v. DeKalb County*, 24 F.3d 1349, 1355 (11th Cir. 1994).

In Count Two of the Complaint, Plaintiff alleges claims under Section 1983 for violation of his constitutional rights under the First and Fourteenth Amendments against Defendants.  Specifically, Plaintiff alleges that Defendants violated his constitutional rights to free speech, due process and equal protection as provided under the First and Fourteenth Amendments, respectively, when they discriminated and retaliated against him during the course of his employment.  (Compl. at ¶ 22).

At this time, the court finds it necessary to address the threshold matter of Eleventh Amendment immunity.  Plaintiff's Section 1983 claims against the ADOC for all relief and

---

[23]  Section 1983 provides in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom,

or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

against Watson in his official capacity for damages are barred by the Eleventh Amendment. *Schopler v. Bliss,* 903 F.2d 1373, 1379 (11th Cir. 1990) ("The Fourteenth Amendment does not by its own force override the States' Eleventh Amendment immunity, nor did Congress abrogate that immunity when it enacted 42 U.S.C. § 1983") (internal citations omitted); *also Smith v. Ala. Dep't of Corr.*, 145 F. Supp. 2d 1291, 1296 (M.D. Ala. 2001) (Albritton, J.). Those claims are thus subject to summary judgment.  However, to the extent that Plaintiff is suing Watson in his official capacity for injunctive relief and in his individual capacity for damages, his Section 1983 claims are not barred by the Eleventh Amendment and must be addressed on their merits.

The court now turns to address those claims.

## 1.    Equal Protection

Plaintiff alleges a violation of his equal protection rights under the Fourteenth Amendment pursuant to Section 1983 based upon Watson's racially discriminatory conduct.[24] Plaintiff has an equal protection right to be free from intentional racial discrimination.  *See Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1478 (11th Cir. 1991).[25]  "In order to

---

[24]  The court notes that Plaintiff also alleges a retaliation claim pursuant to Section 1983. Because the court has already found that summary judgment is appropriate on the merits of Plaintiff's retaliation claim for Title VII purposes, *supra*, the court concludes, for the same reasons, that summary judgment is appropriate on this claim.  *Portera*, 322 F. Supp. 2d at 1299 (applying same standard for retaliation claims under Title VII and Section 1983).

[25]  "The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race."  *Washington v. Davis,* 426 U.S.

26

establish a violation of the Equal Protection Clause, appellees must prove discriminatory motive or purpose." *Cross v. State of Ala., State Dept. of Mental Health & Mental Retardation*, 49 F.3d 1490, 1507-1508 (11th Cir. 1995) (citing *Whiting v. Jackson State Univ.*, 616 F.2d 116, 122 (5th Cir. 1980)).[26]

"When Section 1983 is used as a parallel remedy for violation of section 703 of Title VII [42 U.S.C. § 2000e-2], the elements of the two causes of action are the same." *Id.* (citing *Hardin v. Stynchcomb,* 691 F.2d 1364, 1369 n. 16 (11th Cir. 1982)). *See Harris v. Shelby County Bd. of Educ.,* 99 F.3d 1078, 1082-83 (11th Cir. 1996) (noting that that Title VII and Section 1983 race discrimination claims supported by circumstantial evidence are evaluated using the framework set out . . . in *McDonnell Douglas*); *Richardson,* 71 F.3d at 805 (in cases where § 1983 is employed as a remedy for the same conduct remedied by Title VII, the elements of the two causes of action are the same); *Portera,* 322 F. Supp. 2d at 1294 (noting that the "framework traditionally applied to Title VII claims also applies to a claim for a § 1983 violation based on Equal Protection Clause").

In light of that case law, the court chooses to avoid delving unnecessarily into a

---

229, 239 (1976). The Equal Protection clause protects individuals from treatment based upon "improper motives" such as race. *Bass v. City of Albany,* 968 F.2d 1067, 1069 (11th Cir. 1992); *see also Busby v. City of Orlando,* 931 F.2d 764, 774 (11th Cir. 1991) (holding that the equal protection clause provides the plaintiff "a right to be free from racial discrimination") (citation omitted); *Williams v. Consol. City of Jacksonville*, 341 F.3d 1261, 1268 (11th Cir. 2003) (recognizing an equal protection right to be free from employment discrimination).

[26] In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981.

discussion of the elements of Plaintiff's Section 1983 equal protection claim and whether he can establish that claim.  Having found above that Plaintiff's Title VII claims fail, *supra*, the court concludes that Plaintiff's equal protection clause claim correspondingly fails.  *See Portera*, 322 F. Supp. 2d at 1294 ("[T]o the extent that [Plaintiff's] equal-protection claims are identical to the Title VII claims which the court considered on the merits, these claims fail for the same reasons her Title VII claims fail.").  Consequently, Defendants are entitled to summary judgment on Plaintiff's equal protection claim.

### 2.     *Due Process and First Amendment*

As stated, once the party seeking summary judgment has informed the court of the basis for the motion, the burden shifts to the nonmoving party to demonstrate why summary judgment would be inappropriate.  *Celotex,* 477 U.S. at 323; *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115-17 (11th Cir. 1993).  Plaintiff mentions his Due Process Clause and First Amendment claims in his Complaint, and he has not expounded upon these claims since then; he has not submitted any evidence to support these claims.  Because Plaintiff has not met his burden, summary judgment will be granted on these claims.  *See Portera*, 322 F. Supp. 2d at 1293.

Having considered all of Plaintiff's claims and the evidence in the record before it, the court finds that a reasonable factfinder could not conclude that Plaintiff has established

a prima facie case for any of his claims.  Defendants are entitled to summary judgment.[27]

## V. CONCLUSION

For the reasons stated above, it is hereby ORDERED that Motion for Summary Judgment (Doc. # 20) is GRANTED.

It is further ORDERED that the pretrial conference set for July 12, 2005 is CANCELED.

The Clerk of the Court is hereby DIRECTED to remove the above-styled case from the August 15, 2005 trial docket.

A separate final judgment will be entered in accordance with this Memorandum Opinion and Order.

DONE this 9th day of June, 2005.


                              /s/ Mark E. Fuller
         _____
                              CHIEF UNITED STATES DISTRICT JUDGE

---

[27]  The court pretermits discussion of Defendants' additional arguments in support of summary judgment as it finds that the issues addressed in this Opinion are dispositive.